UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION AT COLUMBUS

| | | |
|---|---|---|
| MICHAEL D. SINGLETON, | : | Case No. 2:23-cv-164 |
| Petitioner, | : | |
| vs. | : | Chief Judge Algenon L. Marbley |
| | : | Magistrate Judge Peter B. Silvain, Jr. |
| WARDEN, LEBANON CORRECTIONAL INSTITUTION, | : | |
| Respondent. | : | |

## REPORT AND RECOMMENDATIONS[1]

Petitioner, Michael D. Singleton, a state prisoner proceeding *pro se*, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court upon the Petition (Docs. 1, 3), the Return of Writ (Doc. 15), and the state court record. (Docs. 13, 13-1, 13-2, 13-3, 13-4, 13-5, 13-6, 14). For the reasons that follow, it is **RECOMMENDED** that this action be **DENIED** and **DISMISSED**.

### I. FACTUAL BACKGROUND

On May 9, 2019, a Delaware County, Ohio grand jury indicted Singleton on two counts of forcible rape and one count of abduction with a sexual motivation. (Doc. 13, at PAGEID #89-91). On August 23, 2019, Singleton was charged via bill of information with an additional count of witness intimidation. *Id.* at 96. The trial was originally scheduled to commence on November 26, 2019. On that date, prior to jury selection, Singleton pled guilty to the witness intimidation count. *Id.* at 117-19; (Doc. 14, at PAGEID #1256-67). The parties intended to proceed to trial on the

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

remaining three counts, but during voir dire the trial court granted a motion for a mistrial based on the defense's argument that prospective jurors saw deputies escorting Singleton through a "jail" door in the courtroom. (Doc. 14, at PAGEID# 1338-42). The trial was rescheduled for June 9-11, 2020. (Docs. 13-1, 13-2, 13-3, 13-4, 13-5, 13-6). The Court of Appeals, Fifth District ("Court of Appeals") found that the following facts were adduced at trial:

> {¶2} Carrie Wooten began exchanging FaceBook messages with Singleton in March 2019. Singleton claimed that he knew Wooten from high school, but she did not remember him. They communicated through written messages in FaceBook Messenger, exchanged voice-mail messages, and used FaceTime to communicate face to face. The messages became annoying to Wooten as they were taking up a lot of time and she found Singleton "seemed to have what [she] would call drama associated with him." She quit responding and deleted his messages from her phone to preserve space in its memory.
>
> {¶3} Singleton messaged Wooten again on April 18, 2019, about two weeks after their last contact, and they resumed their electronic conversation. Wooten began talking with him again because the tone of his messages had changed. "He started sounding like he was trying to be more stable. He was talking about getting right with God, getting right with his family, and wanting to, you know, make amends with them, and get back on track with his life."
>
> {¶4} Singleton claimed to live in Indiana and he expressed a desire to return to Ohio to reconnect with his family. He begged for her assistance. Wooten interpreted his comments as sincere and offered to buy a bus ticket for Singleton to return to Ohio. He accepted the offer and stated he would repay her for the expense.
>
> {¶5} Singleton's arrival time was originally scheduled for April 20, 2019, at 8:00 p.m., but he missed that bus and bought a ticket that brought him to the bus station just before 2:30 a.m. Wooten met him at the bus station and drove him to her home. She asked about when he would want to meet with his mother, but he avoided that topic. She asked that he sleep on the couch, but he refused, and insisted that he sleep in her bed. They talked until they fell asleep. In the morning they engaged in consensual sex that Wooten described as normal and did not involve hair-pulling, biting, slapping, angry talk or any uncomfortable positions.

{−6} Wooten was not scheduled to work on April 21st, the day after Singleton's arrival, so they stayed together and talked. Wooten urged Singleton to go to his mother's home, but he avoided discussing the topic and did not leave.

{−7} Over the next few days they spent little time together as Singleton had found employment and was generally at work while Wooten was home. He did continue to send messages to Wooten while she was at work and, occasionally, the messages were intimate and explicit. Singleton stated at one time that he loved Wooten, and Wooten responded by sending a heart shaped icon. She later told him that she just did not feel that way about him and began keeping him at arm's length. Singleton continued to send multiple text and voice messages while Wooten was at work, often unable or unwilling to respond. On Thursday, April 25, 2019, Wooten delivered a message: "I literally just saw these and listened to them ... I honestly don't know what to say ... I told you I don't do drama or BS and all you do is this back and forth bi-polar shit that I'm not wanting nor needing. I'm sure you're sorry and what not but I think it's time for you to move on ... I'm sorry I really am but I'm over it for real." Singleton did not leave and on Friday afternoon she sent him a text message:

> "I said, "I'm not playing anybody ... I work and I come home and sleep and I told you that before you got here. As far as I remember I told you we had to get to know each other but I'm pretty sure you had it in your head that we were just jumping into relationship slash living together right away. I told you yesterday that I was over it and I haven't changed my mind about it. I obviously do what I say I'm gonna do cuz you're here. Like I said I forgive what's been said and I wish no ill will on you but I'm over it and yes you're gonna have to find someone else to stay with I'm sorry."

{−8} When she returned home from work Saturday morning, April 27, Singleton was on the couch. She did not speak to him, but went to bed and awoke around 2:00 p.m. to find her adult son, Aaron Sebach, and Singleton talking. Singleton was drinking vodka at the time. All three went out and purchased alcohol, but the parties have conflicting stories regarding whether they all went together, or Wooten went by herself. Wooten remembers ordering a pizza before leaving for a local department store where she made purchases, including a bottle of wine.

{−9} When Wooten returned, Singleton was still present, but neither spoke to the other. She described it as an awkward environment where she and Singleton were just there and not speaking to each other. The pizza had arrived and Sebach and

3

Singleton had started eating. Wooten had a glass of wine with her pizza and she had a shot of hard liquor with her son and Singleton.

{–10} Sebach invited some of his friends over and they had planned to go out, but he was concerned about leaving his mother with Singleton. While he could not clearly articulate the source of his concern, he was bothered by a feeling that the relationship between his mother and Singleton had worsened. Nevertheless, he left with his friends at Wooten's urging.

{–11} Wooten had no desire to speak with Singleton that evening and was viewing FaceBook for relief and distraction. Singleton asked who she was talking to, and she responded "no one." He hit her phone and asked again who she was talking to and she responded that she was just scrolling through FaceBook and showed her phone.

{–12} He then came up to her right side, pulled her pants down to expose the top of her buttocks and bit her on the thigh, causing Singleton to react to the pain by turning, pushing Singleton and asking him why he did that, telling him that it hurt. She attempted to put some space between her and Singleton by moving into the living room from the kitchen, but Singleton tackled her to the ground and pushed her legs up beside her head and slapped her face. He grabbed her arm and forced her up the stairs, laughing at her questions and telling her he has all night to do this.

{–13} He dragged her to the bedroom and threw her to the bed and again forced her legs up beside her head and slapped her face. He removed her pants, and anticipating his next step, she asked that he stop because she was still on her period. He removed her tampon, bit her thighs and vagina and digitally penetrated her vagina and anus. He then stood to remove his pants and then forcibly penetrated her vagina with his penis, ultimately ejaculating inside Wooten. Wooten testified that she did not consent to any of this sexual conduct.

{–14} Singleton cleaned the blood from his genitals and re-dressed, then sat on the bed. Rocking back and forth on the bed and clapping his hands, Singleton questioned Wooten's mental state, asking if she was bi-polar telling her that he needed to "figure things out." Singleton next wrapped at-shirt around her neck and tightened it, restraining her breathing and telling her that he should take care of her now so she could not say anything. He left the bedroom, telling her to stay put while he smoked a cigarette. Singleton went outside the apartment and, after he closed the door Wooten followed and locked the door, returned to the bedroom and locked that door and called her son. When she reached him, she told him that Singleton

had hit her and asked that he come home. She called 911 and put the phone under her bed and then retrieved a pistol from under the bed.

{−15} Singleton re-entered the apartment, apparently bypassing the door locks with a credit card and confronted Wooten in the bedroom. She pointed the gun at him and he laughed but did not enter the bedroom. He paced in the doorway and then went downstairs where he was confronted by Sebach. Sebach told him to leave and Singleton refused until Sebach produced a gun and ordered him from the home.

{−16} Sebach checked on his mother and found her wrapped in a towel, wearing a tank top and still holding a pistol. Her face was red and she had some bumps and she was obviously very upset. She mentioned that she had called 911, so he expected the police to arrive soon. Wooten stayed in her room and fell asleep, vomiting on herself during the night. The police did not arrive and, in the morning, Sebach called his sisters. They came to the apartment and took Wooten to the police department and then to the hospital for an exam by a Sexual Assault Nurse Examiner. While Wooten showed no obvious signs of injuries, she complained of pain in her neck and legs and walked with a limp.

{−17} Detective Sergeant Michael Bolen of the Delaware Police Department spoke with both Wooten and her son multiple times, photographed Wooten's apartment and gathered relevant evidence. At his request, Wooten gave Detective Bolen her FaceBook password and he was able to retrieve text and voice messages exchanged by Wooten and Singleton.

*State v. Singleton*, 2021-Ohio-3010, 2021 WL 3879448, at *1-3 (Ohio App. 5 Dist., 2021) (citations omitted); (Doc. 13, at PAGEID #206-27).

On June 11, 2020, the jury found Singleton guilty of two counts of rape and one count of abduction. (Doc. 13-6, at PAGEID #1237-38).  The trial court merged the abduction charge with the first count of rape and sentenced Singleton to an indefinite minimum term of ten years for each rape count to run consecutively for an aggregate sentence of twenty to twenty-five years.  (Doc. 13, at PAGEID #139-42).

## II. PROCEDURAL HISTORY

On June 23, 2020, Singleton appealed his rape and abduction convictions to the Court of Appeals. (Doc. 13, at PAGEID #159, 195-219). He raised two assignments of error:

(1) The weight of the evidence does not support the guilty verdicts on either count of rape or the count of abduction.

(2) [Singleton] was deprived of a fair trial in violation of due process when the prosecution committed misconduct by misstating the law regarding the mental state for rape during closing arguments.

*Id.* at 162.

On August 31, 2021, the Court of Appeals denied Singleton's first assignment of error, overruled his second, and affirmed the convictions. *Id.* at 221-37. On November 24, 2021, Singleton filed a motion for leave to file a delayed notice of appeal with the Supreme Court of Ohio. *Id.* at 244-48. He principally argued that his appeal was untimely because he did not have access to the law library due to COVID-19. *Id.* at 245. The Supreme Court of Ohio granted Singleton's motion and directed him to file a memorandum in support of jurisdiction within thirty days. *Id.* at 268. On January 21, 2022, the Supreme Court of Ohio *sua sponte* dismissed Singleton's appeal for failure to prosecute. *Id*. at 270.

## III. HABEAS PROCEEDINGS

On January 13, 2023, Singleton, proceeding *pro se*, filed the instant federal habeas petition, raising one ground for relief:

> **GROUND ONE**: Violation of due process depriving right to a fair trial.
>
> **Supporting Facts**: The prosecution committed misconduct by misstating the law regarding the mental state for rape during closing argument.

(Doc. 1, at PAGEID #6; Doc. 3, at PAGEID #24).

On July 13, 2023, Respondent filed a Return of Writ. (Doc. 15). Respondent contends that Singleton's claim is procedurally defaulted and, alternatively, lacks merit. Respondent explains that Singleton's claim for relief is procedurally defaulted because he failed to complete one round of state appellate review. *Id.* at 1356-60. Further, Respondent argues the claim lacks merit because the Court of Appeals' adjudication of the claim was neither contrary to nor an unreasonable application of federal law. *Id.* at 1361-72.

IV. **STANDARDS OF REVIEW**

    A. **AEDPA**

Because this is a habeas corpus case, provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") apply. *See generally* 28 U.S.C. § 2254; *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The United States Supreme Court has described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, 571 U.S. 12, 19-20 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA ... imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt") (internal quotation marks, citations, and footnote omitted).

AEDPA limits the circumstances under which a federal court may grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in a state court proceeding. Specifically, under AEDPA, a federal court shall not grant a writ unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. §

7

2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). Section 2254(d)(1) circumscribes a federal court's review of claimed legal errors, while Section 2254(d)(2) places restrictions on a federal court's review of claimed factual errors. This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015). Additionally, this Court's habeas review is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 563 U.S. 170 (2011).

      **B.**     **Procedural Default**

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to first present those claims to the state courts for consideration. 28 U.S.C. § 2254(b), (c). If the prisoner fails to do so, but still has an avenue open to present the claims, then the petition is subject to dismissal for failure to exhaust state remedies. *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (citing *Picard v. Connor*, 404 U.S. 270, 275-78 (1971)). Where a petitioner has failed to exhaust claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas." *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

Over time, the term "procedural default" has come to describe a situation where a person convicted of a crime in a state court fails (for whatever reason) to properly present a particular claim to the highest court of the state so that the state has a fair chance to correct any errors made in the course of the trial or the appeal, before a federal court intervenes in the state criminal process. This "requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review." *Hicks v. Straub*, 377 F.3d 538, 552-53 (6th Cir. 2004)

8

(quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)).  One of the aspects of "fairly presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted.  That means that if the claims are not presented to the state courts in the way in which state law requires, and the state courts therefore do not decide the claims on their merits, neither may a federal court.  As the Supreme Court found in *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), "contentions of federal law which were not resolved on the merits in the state proceeding due to [the] failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case – that is, they are "procedurally defaulted."  It is well settled that "[a] common example of a procedural default is a failure to raise a claim in state court in a timely manner." *Gibbs v. Huss*, 12 F.4th 544, 550 (6th Cir. 2021).

To determine whether procedural default bars a habeas petitioner's claim, courts in the Sixth Circuit engage in a four-part test.  *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *see also McNeill v. Bagley*, 10 F.4th 588, 595 (6th Cir. 2021) (citing the four-part *Maupin* standard).  First, the court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with the rule.  Second, the court must determine whether the state courts actually enforced the state procedural sanction.  Third, the court must determine whether the forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim.  Finally, if the court determines that a state procedural rule was not complied with and the rule has an adequate and independent state ground, then the petitioner may still obtain review of his claims on the merits if the petitioner establishes: (1) cause sufficient to excuse the default and (2) that he was actually prejudiced by the alleged constitutional error.  *Maupin*, 785 F.2d at 138.  In order to establish

cause, a petitioner must show that "some objective factor external to the defense" impeded the petitioner's efforts to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The petitioner bears the burden of showing cause and prejudice. *Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir. 2001).

V.     **DISCUSSION**

    A.     **Procedural Default**

Respondent contends that Singleton's ground for relief is procedurally defaulted because he failed to timely file his brief with the Supreme Court of Ohio and his appeal was dismissed for failure to prosecute. (Doc. 15, at PAGEID #1356-60). As noted above, the Supreme Court of Ohio granted Singleton's motion for a delayed appeal "due to the COVID-19 pandemic…" (Doc. 13, at PAGEID #263). However, Singleton failed to meet the deadline, and the Supreme Court of Ohio dismissed his appeal:

> Appellant has not filed a memorandum in support of jurisdiction, due January 10, 2022, in compliance with the Rules of Practice of the Supreme Court of Ohio and therefore has failed to prosecute this cause with the requisite diligence. Cause dismissed.

*Id.* at 270.

The record establishes that the Supreme Court of Ohio enforced a procedural sanction and the rule at issue—imposing a thirty-day deadline for filing a memorandum in support of jurisdiction—is an adequate and independent state ground upon which to deny relief. *Sohrabi v. Richland Corr. Inst. Warden*, Case No. 12-cv-007, 2013 WL 3209533, at *9 (N.D. Ohio Jun. 18, 2013) (and cases cited therein); *Jones v. Warden, Lebanon Corr. Inst.*, Case No. 1:06-cv-212, 2007 WL 2326867, at *4 (S.D. Ohio Aug. 10, 2007).

In his Petition, Singleton concedes that his claims were not raised before the Supreme Court of Ohio but asserts that his failure to do so should be excused because, "[p]etition filed and

10

memorandum in support of jurisdiction was late due by days to COVID-19 restrictions here at LECI." (Doc. 3, at PAGEID #31). The docket from the Supreme Court of Ohio does not reflect that Singleton filed a late memorandum in support of jurisdiction, (Doc. 13, at PAGEID #290), and he has not provided the Court with a copy. In any event, Singleton has not established the necessary proof to excuse a procedural default based on the COVID-19 pandemic.

A petitioner offering COVID-based arguments to excuse a procedural default or an untimely filing is required to specifically demonstrate how COVID-based restrictions or delays caused his failure to comply with a state procedural rule or file a timely petition. "The bottom line is that the COVID-19 pandemic does not automatically warrant equitable tolling for a petitioner who seeks it on that basis. The petitioner must establish that he was pursuing his rights diligently *and* that the COVID-19 pandemic specifically prevented him from filing his motion." *Gilmore v. Warden, London Corr. Inst.*, Case No. 1:22-cv-417, 2023 WL 5048081, at *6 (S.D. Ohio Aug. 8, 2023) (citation omitted); *see also Little v. Sheldon*, Case No. 3:20-cv-02527-BYP, 2023 WL 2666116, at *6-7 (N.D. Ohio Mar. 6, 2023) (rejecting "bare-bones argument" courts have rejected because it failed to show that the pandemic specifically prevented the petitioner from filing his petition); *Jones v. Yost*, No. 3:22-CV-352, 2024 WL 579748, at *6 (S.D. Ohio Feb. 13, 2024) (petitioner must show that he was pursuing his rights diligently and that the COVID-19 pandemic specifically prevented him from complying with a state procedural rule).

Here, Singleton was provided with an extension of time to file his memorandum in support of jurisdiction, but he has failed to provide the specific proof required to demonstrate that the pandemic hindered his ability to comply with the deadline. Accordingly, Singleton's sole ground for relief is procedurally defaulted. Moreover, regardless of the procedural default, as explained below, Singleton's claim would be dismissed because it lacks merit.

11

### B. Prosecutorial Misconduct Claim

Singleton contends that his due process rights were violated when the prosecutor misstated the law during his closing argument. Respondent argues that Singleton cannot meet the standard for relief because the Court of Appeals' dismissal of the claim was not objectively unreasonable. (Doc. 15, at PAGEID #1361-72).

During his closing argument rebuttal, the prosecutor made the following comments, which form the basis of Singleton's misconduct claim[2]:

> If you were to believe defense counsel that this is just about Michael's perception, then the State submits to you that the overwhelming evidence in this case combined with the testimony should demonstrate to you that is an offensive statement. That if someone says I didn't think I raped her, then that person could not be found guilty.
>
> MR. MANGO: Objection. Not the case.
>
> THE COURT: Overruled. Go ahead.

(Doc. 13-6, at PAGEID #1183).

The trial court instructed the jury that the closing arguments were not evidence. (Doc. 13-6, at PAGEID #1205). It also instructed the jury on the elements required to convict Singleton on each count, including the specific intent required to commit rape. *Id.* at 1208-13. During deliberations, the jury submitted a question, "what is the specific law of consent?" *Id.* at 1229. The trial court responded to the jury's question with the following instruction:

> The prosecution in a rape case is not required to prove the alleged victim's lack of consent. In determining whether an alleged victim has consented to sexual conduct, you should consider all of the facts and circumstances, including any words exchanged between the alleged victim and the Defendant as well as their actions. The prosecution to prove the crime of rape must prove all of the elements of the crime, including the claim that the Defendant purposely compelled the alleged victim to submit by force or threat of force. I have defined the terms purposely,

---

[2] In his direct appeal brief, Singleton argued that a longer passage of dialogue from the rebuttal was objectionable, (Doc. 13, at PAGEID #187), but the Court of Appeals concluded that the cited language was the only portion of the argument that was objected to by the defense. *Id.* at 233.

12

> force, and threat, and I've explained to you that the prosecution is not required to prove that an alleged victim physically resisted the Defendant's actions.

*Id.* at 1232-33.

Singleton argued on direct appeal of his conviction that the prosecutor's rebuttal argument constituted misconduct and violated his constitutional rights. (Doc. 13, at PAGEID #164). He asserted that the prosecutor misstated the law because the state was required to prove that he subjectively intended to force Wooten to engage in sex and Singleton's intent was a disputed fact at trial. *Id.* at 187-89.

The Court of Appeals engaged in an evaluation of Ohio precedent and rejected Singleton's argument that the prosecutor misstated the applicable law. *Id.* at 221-37.

> We find no support in [the caselaw] for Singleton's conclusion that he may be acquitted based upon his subjective perception that the sex was consensual, and his argument reveals that he does not rely on that mischaracterization of the law. First, he notes that the jurors must believe him and then he describes the parties conduct in light of the surrounding facts and circumstances to support his contention that Wooten's contention that the rape was not consensual should not be believed. Singleton is relying on the surrounding facts and circumstances to bolster his argument that the sexual conduct was consensual and, in fact, offers no evidence regarding his subjective perception.

*Id.* at 236. The Court of Appeals also concluded that the prosecutor's comments did not deprive Singleton of a fair trial because the jury was properly instructed on the law and no direct evidence was offered of Singleton's subjective intent. *Id.*

In *Darden v. Wainwright*, the Supreme Court held that in evaluating a prosecutorial-misconduct claim, a court must determine "whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." 477 U.S. 168, 181 (1986) (internal quotation marks omitted). On habeas review, "the Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because constitutional line drawing [in prosecutorial misconduct cases] is

13

necessarily imprecise." *Slagle v. Bagley,* 457 F.3d 501, 516 (6th Cir. 2006) (internal quotation marks omitted). Because "the *Darden* standard is a very general one, leaving courts more leeway ... in reaching outcomes in case-by-case determinations," federal courts cannot set aside a state court's conclusion on a prosecutorial-misconduct claim unless a petitioner cites to other Supreme Court precedent that shows the state court's determination in a particular factual context was unreasonable. *Id.* at 2154-55 (internal quotation marks and citation omitted). Egregious prosecutorial misrepresentations of the elements of a crime during closing argument may mislead the jurors and contaminate the verdict, but "arguments of counsel generally carry less weight with a jury than do instructions from the court," and prosecutorial misrepresentations "are not to be judged as having the same force as an instruction from the court." *Boyde v. California,* 494 U.S. 370, 384-85 (1990).

"[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). Acknowledging the deference this Court owes to the Court of Appeals, its determination that the prosecutor's comments were a correct statement of Ohio law forecloses Singleton's misconduct claim.

Moreover, Singleton has failed to meet the standards set forth in *Darden* and *Slagle*. He has failed to demonstrate that "the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden,* 477 U.S. at 181. Additionally, he cannot point to any United States Supreme Court case that supports habeas relief under these factual circumstances. *Slagle*, 457 F.3d at 516. Because the jury was properly instructed on the law, Singleton was not deprived of a fair trial. Although Singleton argued on direct appeal that the prosecutor's comments were misconduct because there was evidence entered at trial that

14

Wooten sent text messages inferring that she would consent to sex with him, (Doc. 13, at PAGEID #189), the prosecutor's isolated comment during rebuttal cannot be considered a deprivation of due process when the jury was instructed that rape required a finding that Singleton compelled Wooten to engage in sex by threat or force, (Doc. 13-6, at PAGEID #1208-09), and was also twice instructed to consider all facts and circumstances in determining whether Singleton purposefully committed the crime of rape, (Doc. 13-6, at PAGEID #1232-33).

For these reasons, the Court cannot say that it was objectively unreasonable for the Court of Appeals to deny Singleton's claim of prosecutorial misconduct. Accordingly, even if Ground One was not procedurally defaulted, it would be subject to dismissal for lack of merit.

## VI. CONCLUSION

Ground One is procedurally defaulted and, alternatively, is without merit. For the foregoing reasons, the Undersigned **RECOMMENDS:**

1. Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1, 3) be **DENIED** and this action be **DISMISSED** with prejudice.

2. A certificate of appealability should not issue with respect to the petition because petitioner has not stated a "viable claim of the denial of a constitutional right" or presented an issue that is "adequate to deserve encouragement to proceed further." *See Slack v. McDaniel*, 529 U.S. 473, 475 (2000) (*citing Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3. With respect to any application by a petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and therefore **DENY** any petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity. *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman*, 117 F.3d 949, 952 (6th Cir. 1997).

June 4, 2024                                              s/Peter B. Silvain, Jr.
                                                          Peter B. Silvain, Jr.
                                                          United States Magistrate Judge

## **NOTICE REGARDING OBJECTIONS**

If any party objects to this Report and Recommendations, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendations *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendations.  *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.